FILED
2022 Jun-02  PM 02:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| EBONIE CARLISLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 7:20-cv-01895-LSC |
| | ) | |
| RHODES & RHODES | ) | |
| FAMILY DENTISTRY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OF OPINION

Plaintiff Ebonie Carlisle ("Carlisle"), an African American female, brings this action against her former employer, Rhodes & Rhodes Family Dentistry ("Rhodes"). Plaintiff alleges that (1) Defendant discriminated against Plaintiff under Title VII and Section 1981 by Defendant not giving Plaintiff an assistant, requiring Plaintiff to assist Caucasian employee's patients, instructing Caucasian workers not to assist the African American employees, and firing Plaintiff; (2) Plaintiff was discriminatorily discharged under Title VII and Section 1981; and (3) Defendant retaliated against Plaintiff because of her complaint of disparate treatment. Defendant filed a Motion for Summary Judgment. The motion has been

fully briefed and is ripe for review. For the reasons stated below, Defendant's motion is due to be granted.

## I.  Facts

Defendant, Rhodes, is a dental practice owned by sisters Dr. Melinda Rhodes King ("Dr. Melinda") and Dr. Belinda Rhodes King ("Dr. Belinda"), who are African American.[1] Drs. Melinda and Belinda hired Plaintiff, Ebonie Carlisle ("Carlisle"), on or around February 25, 2013, to work as a dental assistant. Defendant employed Plaintiff on an at-will basis.  Plaintiff worked as a dental hygienist until Defendant terminated her employment on August 1, 2019.

In addition to Plaintiff, the following individuals worked as dental hygienists: Tracey Robinson ("Robinson"), Deana Ross ("Ross"), and Heather Tinker ("Tinker"). Robinson is African American, and Ross and Tinker are Caucasian. Defendant employed Anna Marie Smith ("Smith") and Larrin Durrett ("Durrett") as dental hygienist assistants. Smith and Durrett are both Caucasian. Defendant also employed Lindsey Herd ("Herd") as the office manager.

Plaintiff chose to treat one patient per hour for an average daily patient count of six to eight patients in one hygiene room per day. (Docs. 17 at 8 & 25 at 3.) Plaintiff

---

[1] The Court gleans these "facts" from the parties' submissions of "undisputed facts" and the Court's examination of the record. These are "facts" for summary judgment purposes only. Their inclusion in this Memorandum of Opinion does not signal their veracity. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

did not have two hygiene rooms because she "[could not] clean patients in 30 minutes" and felt like she "need[ed] to give [her] patients [her] undivided attention their whole full 45 minutes to an hour." (Doc. 18-3 at 88-89.) Plaintiff admits that Tinker treated twelve to sixteen patients a day. (Doc. 17 at 4 & Doc. 24 at 3.) Ross also saw more patients than Plaintiff because she finishes "with her patients within 15 to 20 minutes" and "nine times out of ten, [Ross] could get the overflow room to clean the other patients that would be there." (Doc. 18-3 at 92-93.) Plaintiff was only asked or required to get somebody from the overflow room if Ross was busy at that time. (Doc. 18-3 at 92-93.)

In May 2018, approximately one year and three months before Defendant fired Plaintiff, an incident occurred between Plaintiff and Durrett. Durrett entered the room Plaintiff was in, opened a drawer, and hit Plaintiff's knee with the drawer. Plaintiff then told Durrett that if she did that again without saying "excuse me," then she would "punch her in the face" the next time. (Doc. 18-3 at 100.) Because of the incident, both Plaintiff and Durrett were counseled by Herd. (Doc. 18-3 at 103.)

Then, in April of 2019, approximately four months before Plaintiff was fired, Plaintiff received a performance evaluation from Dr. Belinda. In addition to stating that Plaintiff was exceeding expectations in all categories, the evaluation also stated

"It's a joy to have you on our team! We all love your joyful personality, just try to be less playful/more courteous to Lindsey because temps/patients might not understand your two's relationship." (Doc. 18-9 at 4.) When asked about this in her deposition, Plaintiff stated that she understood that, as of April 2019, the practice was concerned about her behavior towards Herd. (Doc. 18-3 at 109.)

In June of 2019, one month before Plaintiff's termination, Plaintiff testifies that she was finishing with a patient at 11:50 AM when Smith came in and asked if she wanted Ross's patient. (Doc 24-2 at 132:5-10.) Plaintiff told her no and finished with her patient at about 11:55 AM, cleaned her room, and left for lunch around 12:00 PM . (Doc 24-2 at 132:5-23.)

On July 31, 2019, the day before Plaintiff's termination, Herd and Plaintiff got into an argument where Herd told Plaintiff that she was not a team player and stated that people were afraid to ask her for help. (Doc. 25 at 12.) When asked what about Herd's statements were racist, Plaintiff could not give a concrete reason and responded that it felt like she was picking on her. (Doc. 18-3 at 140.)

The next day, Plaintiff complained to Dr. Melinda. During the conversation, Plaintiff told Dr. Melinda that she did not like how Ross and Tinker received help when they needed it, but she and Robinson would not receive the same help if they were behind. (Doc. 18-3 at 147.) During this conversation, Plaintiff admits that she

likely did not mention race. (Doc 18-3 at 147.) Nevertheless, Dr. Melinda understood Plaintiff thought the unfair treatment was based on race. (Doc. 24-1, King Depo. at 42:17-23.)

Later that day, Plaintiff got into another heated argument with Herd. During this argument, Herd brought up the threat Plaintiff made in May of 2018 and that everyone thought Plaintiff was mean and not helpful. Plaintiff and Herd were "screaming at each other." (Doc. 18-3 at 150:8-9.) During that argument, according to Dr. Melinda, Plaintiff was "invading [Herd]'s personal space and Plaintiff's tone and body language were very hostile (Doc. 19-1 at 48-49.) After the argument, Plaintiff was sent home and later fired. Plaintiff was informed that she was fired for insubordination, being combative, and failing to see patients. (Doc. 24-11.)

In March of 2020, nine months after Plaintiff's firing, Durrett received an Employee Warning Notice from Defendant. The warning stated that Durrett: (1) argued with and questioned doctors; (2) moved work to others without permission; (3) was unwilling to help others; (4) had body language and facial expressions that give the impression she did not want to be there. (Doc. 24-12.) The warning was signed by Herd. (Doc. 24-12.)

## II.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). In making such a determination, this Court must consider all the facts and draw all inferences in the nonmoving party's favor. *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016). This Court does not weigh evidence at the summary judgment stage. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). Instead, the Court views all the evidence and determines "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

## III.  Analysis

### A. Title VII Numerosity Requirement

Defendant first alleges that Plaintiff cannot meet her burden of proving that Defendant employed fifteen or more employees. (Doc. 17 at 10.) Title VII has an "employee-numerosity requirement," which is designated to "spare very small businesses from Title VII liability." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006). Under the employee-numerosity requirement, organizations are not subject to Title VII"s proscription against unlawful employment practices unless they had "fifteen or more employees for each working day in each of twenty or more

calendar weeks in the current or preceding calendar year." 42 U.S.C. §§ 2000e(b), 2000e–3(a); *McGinnis v. Ingram Equipment Co.*, 918 F.2d 1491, 1493 (11th Cir.1990). Plaintiff has the burden of proving whether Defendant meets the numerosity requirement, and it appears Plaintiff fails to do so.

Defendant claims it never employed fifteen or more employees while it employed Plaintiff if one excludes Drs. Melinda and Belinda. Plaintiff argues that (1) Drs. Melinda and Belinda are included in the total number of employees and (2) even if they are not included, there are still fifteen employees because Wendy Spencer, the woman who cleans the office, should be included.

First, Plaintiff has not provided enough evidence to show that Drs. Melinda and Belinda are employees under Title VII. Second, Plaintiff has also not shown that Spencer should be included in the total number of employees. When asked about a photo, Plaintiff named and numbered fifteen individuals present in Defendant's group photo. (Doc. 18-3 at 189.) Absent from the photo were Plaintiff and a lady, Wendy Spencer, who cleaned the office. (Doc. 18-3 at 189.) When asked, Plaintiff stated that she "thinks" the cleaning lady is employed by Defendant. (Doc. 18-3 at 189.) In Dr. Belinda's declaration, she states that she hired Spencer on a contract basis. (Doc. 18-2 at 2 ¶ 13.) Plaintiff has not provided any evidence other than Plaintiff's statement that she thinks Spencer is an

employee. This is not sufficient. Even though Plaintiff has failed to demonstrate that Defendant employed fifteen or more employees at the time, the Court will analyze Plaintiff's claims.

### B. Prima Facie Case for Disparate Treatment Claim and Discriminatory Discharge

Carlisle brings a claim of racial discrimination under Title VII and 42 U.S.C. § 1981. Under Title VII and Section 1981, an employer may not discharge or otherwise discriminate against an employee because of race. *See* 42 U.S.C. § 2000e-2 (a) (1); *see also* 42 U.S.C. § 1981. To establish a Title VII claim, a plaintiff may proffer either direct or circumstantial evidence of discrimination. *Jefferson v. Sewon America, Inc*, 891 F.3d 911, 920 (11th Cir. 2018). Direct evidence of discrimination consists of "only the most blatant remarks, whose intent could mean nothing other than to discriminate." *Rojas v. Florida*, 285 F.3d 1339, 1342 n. 2 (11th Cir.2002) (quoting *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir.1999)).

Because Carlisle neither offers nor contends there was direct evidence of racial discrimination, this Court must evaluate whether she has produced sufficient circumstantial evidence of racial discrimination. Absent direct evidence of racial discrimination or retaliation, such as specific statements made by the employer's representatives, a plaintiff may demonstrate circumstantial evidence of disparate treatment through the McDonnell Douglas burden-shifting framework. *See*

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); see also *Tex. Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

Under this framework, the aggrieved employee creates a presumption of unlawful discrimination by first establishing a prima facie case of discrimination. *See Lewis v. City of Union City*, 918 F.3d 1213, 1220-21 (11th Cir. 2019) (en banc). The burden then shifts to the employer "to articulate a legitimate, nondiscriminatory reason for its actions." *Id*. at 1221 (citing *Burdine*, 450 U.S. at 253). The burden at this stage "is exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). It is merely a burden of production, not a burden of proof. *Id*. If the employer proffers a legitimate, nondiscriminatory reason, the burden returns to the employee to prove that the employer's reason is a pretext for unlawful discrimination. *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008).

Although the McDonnell Douglas framework is one way of showing discriminatory intent, it is not the only way to show discriminatory intent in a Title VII discrimination claim. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "[T]he plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.*

i. ***Disparate Treatment***

To establish a prima facie case for racial discrimination, a plaintiff must show: (1) she is a member of a protected class, (2) she was qualified for her position, (3) she was subjected to an adverse employment action, and (4) she was treated less favorably than similarly situated individuals outside her protected class or replaced by someone outside her protected class. *See Lewis*, 918 F.3d at 1221.

Carlisle contends she was treated differently from other similarly situated employees by: (1) being segregated from Caucasian employees; (2) not being given an assistant; (3) being required to assist the Caucasian dental hygienists' patients when they were already working with a patient; (4) Caucasian workers being told not to assist her; and (5) being fired. (Doc. 1 at 17.) Defendant does not dispute that Plaintiff belongs to a protected class or was qualified for the position. Further, Because Plaintiff was replaced by someone outside her protected class, Defendant concedes that Plaintiff has established a prima facie case as to her firing. At issue is whether Plaintiff was subjected to an adverse employment action and treated less favorably than similarly situated individuals outside her protected class as described in the remaining four allegations.

"For disparate treatment, an adverse employment action must 'impact the terms, conditions, or privileges of the plaintiff's job in a real and demonstrable

way.'" *Minnifield v. City of Birmingham Dep't of Police*, 791 F. App'x 86, 90 (11th Cir. 2019) (quoting D*avis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001), overruled on other grounds by *Burlington*, 548 U.S. 53, 126). "Proof of 'direct economic consequences' is not required, but a plaintiff must show 'a serious and material change in the terms, conditions, or privileges of employment.'" *Id.* A "similarly situated employee" outside the plaintiff's class, also called a "comparator," must not differ from the plaintiff in "material respects." *Lewis*, 918 F.3d at 1224. "Material" differences between employees might be that the employees engage in different conduct, are subject to different policies, or have different work histories. *Id.* at 1228.

Here, Plaintiff's allegations that she was segregated from Caucasian employees, not given an assistant, required to assist the Caucasian dental hygienists' patients when they were already working with a patient, and not receiving help from Caucasian workers are insufficient to establish a prima facie case of disparate treatment because most do not amount to an adverse employment action. "And, to the extent some of the alleged conduct does, [Carlisle] still fails to establish a *prima facie* case because there is no evidence that a similarly situated individual outside her protected class was treated more favorably." *Gooden v. Internal Revenue Serv.*, 679 F. App'x 958, 964 (11th Cir. 2017).

First, Plaintiff alleges that she was being segregated from Caucasian employees. Specifically, Plaintiff alleges that she and Robinson, who were African American, worked together, and Tinker, Ross, and Smith, who were Caucasian, worked together. (Doc 24-2 at 125:2-17.) The evidence shows that Defendant did not segregate Plaintiff from Caucasian employees. In Plaintiff's affidavit, Plaintiff states that she chose the room that she worked in. (Doc 24-2 at 125:2-17.) Further, Defendant did not make Plaintiff work with Robinson and Plaintiff states that she and Robinson decided to help each other "to get through the day." (Doc 24-2 at 131:2-110.) As a result, there is nothing that shows Defendant segregated its employees. Further, there is no evidence that, even if such a decision was made, it affected Plaintiff's job in a way that constituted an adverse employment action.

Second, Plaintiff alleges she suffered an adverse employment action by not receiving an assistant. As to this allegation, Plaintiff fails to show that she was treated less favorably than similarly situated individuals outside her protected class. Ross and Tinker are the only other dental hygienists outside Plaintiff's protected class, and they both received dental assistants. However, just because Ross and Tinker have the same title as Plaintiff, does not mean they are similarly situated individuals for Title VII purposes. *See Jenkins*, 26 F.4th at 1249 ("[W]hat constitutes a "material" similarity or difference will differ from case to case."). A proper

comparator is similar "in all relevant aspects." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 n.17 (11th Cir. 2011). Because Plaintiff's claim pertains to receiving an assistant, simply having the same title, job description, and supervisor is not enough to be a comparator. The Court also looks to the workload of the employees.

Plaintiff chose to treat one patient per hour for an average daily patient count of six to eight patients. (Docs. 17 at 8 & 25 at 3.) Plaintiff did not have two hygiene rooms because she "[couldn't] clean patients in 30 minutes" and felt like she "need[ed] to give [her] patients [her] undivided attention their whole full 45 minutes to an hour." (Doc. 18-3 at 88-89.) Tinker worked two hygiene rooms and saw more patients than Plaintiff. Plaintiff admits that Tinker treated twelve to sixteen patients per day. (Doc. 17 at 4 & Doc. 24 at 3.) Ross also sees more patients than Plaintiff because she finishes "with her patients within 15 to 20 minutes" and "nine times out of ten, [Ross] could get the overflow room to clean the other patients that would be there." (Doc. 18-3 at 92-93.) Thus, Ross essentially had two hygiene rooms because, according to Plaintiff, Plaintiff would only be asked or required to get somebody from the overflow room if Ross was busy at that time. (Doc. 18-3 at 92-93.) Because Ross and Tinker treat more patients daily than Plaintiff, there are material differences between them and Plaintiff. As a result, Plaintiff fails to show proper comparators to establish a prima facie case.

Third, Plaintiff alleges she was required to assist the Caucasian dental hygienists' patients *when she was already working with a patient.* In Plaintiff's deposition, Plaintiff only points to one instance where she was asked to assist a Caucasian dental hygienist while working with her patient. (Doc. 24-2.) In that instance, Plaintiff testifies that she was finishing with a patient at 11:50 AM when Smith came in and asked if she wanted Ross's patient. (Doc 24-2 at 132:5-10.) Plaintiff told her no and finished with her patient at about 11:55 AM, cleaned her room, and left for lunch around 12:00 PM. (Doc 24-2 at 132:5-23.) Plaintiff was asked to assist, said she was with a patient, and rejected the offer. As a result, Plaintiff fails to show that she was "required" to assist Caucasian dental hygienists' patients when she was already working with a patient or that the request affected Plaintiff's job in any real or demonstrable way.

Fourth, Plaintiff alleges Caucasian workers were told not to assist her. The only evidence as to this allegation comes from (1) Plaintiff's deposition and (2) Plaintiff's EEOC Charge. (Doc. 25 at 13 p. 49) In the EEOC charge, Plaintiff states "I later learned that the Caucasian coworkers were told by Lindsey Herd not to help the African American Hygienists." (Doc. 24-2 at 2.) In Plaintiff's affidavit, Plaintiff recounts that Smith told her that Herd instructed Smith to only help Tinker and Ross. (Doc. 18-3 at 145-46.) Plaintiff states that, when she heard this from Smith,

race was not mentioned and that she did not hear it from Herd herself. (Doc. 18-3 at 145-46.) Plaintiff also alleges in her complaint that Caucasian *coworkers* were told not to help the African American hygienists. But Plaintiff states in her affidavit that only one coworker, Smith, was instructed not to help Carlisle. (Doc. 18-3 at 145.) Thus, Plaintiff is essentially making the same argument discussed above that the Caucasian hygienists were given an assistant, Smith, and the African American hygienists were not. For the same reasons discussed regarding Plaintiff's second alledged adverse employment action, Plaintiff fails to show that similarly situated employees outside her protected class were treated more favorably because there are no proper comparators. Therefore, Plaintiff fails to establish a prima facie case because Plaintiff has not established that this decision was based on race, that it was an adverse employment action, or that there are any proper comparators.

Plaintiff has failed to establish that she suffered an adverse employment action with regard to her disparate treatment claims. "And as for the more borderline actions and decisions, she did not provide sufficient evidence demonstrating that they were based on her race . . . ." *Gooden*, 679 F. App'x at 964. As a result, the Court will turn to that claim.

ii. **Discriminatory Discharge**

Under the *McDonnell Douglas* framework for racial discrimination, Defendant "does not dispute that Plaintiff establishes a prima facie case" for discriminatory discharge. (Doc. 17 at 16.) Plaintiff (1) is a member of a protected class, (2) was qualified for her position, (3) was discharged from her job, and (4) was replaced by someone outside her protected class, a Hispanic woman. Thus, Plaintiff has met her initial burden.

### C. Prima Facie Case for Retaliation

Carlisle also brings a claim of retaliation under Title VII.  Carlisle claims that she was terminated for complaining about what she perceived as a difference in treatment between white and black hygienists. (Doc. 25 at 29.) To establish a *prima facie* case of retaliation, Plaintiff must show that: (1) she engaged in statutorily protected activity; (2) suffered a materially adverse action; and (3) that there was a causal connection between the protected activity and the materially adverse action. *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010). Here, Carlisle has established a *prima facie* case of retaliation. However, Defendant argues that Carlisle has failed to show she engaged in a statutorily protected activity and that she failed to show a causal connection between the protected activity and the materially adverse action.

### i. **Statutorily Protected Activity**

Protected activity includes internal complaints to supervisors. *Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001). However internal complaints that consist only of generalized complaints of unfairness that do not mention race or discrimination are not protected activity. *Coutu v. Martin Cty. Bd. of Cty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) ("Unfair treatment, absent discrimination based on race . . . is *not* an unlawful employment practice under Title VII") (holding that the plaintiff's complaint that she worked hard and deserved a better performance rating was not statutorily protected activity); *Ceus v. City of Tampa*, 803 F. App'x. 235, 246 (11th Cir. 2020) (holding that plaintiff's complaint that mentioned merely the unfair treatment of "bullying" was not protected activity "because it did not mention race or discrimination . . . .").

Defendant argues that Plaintiff did not engage in protected activity when she made her complaint to Dr. Melinda about the difference in treatment of the white and black hygienists. (Doc. 17 at 22.) Defendant claims that "[a]t no point during the meeting did Plaintiff allege that race was at play; in fact, Plaintiff did not say the word "race" when she met with Dr. Melinda." (Doc. 17 at 22.) However, a close reading of the record indicates otherwise. During her deposition, Plaintiff testified that she went to Dr. Melinda and complained about two African American employees being treated differently than two Caucasian employees. (Doc. 18–3 at 227). And Dr.

Melinda testified she understood from Carlisle's perspective she thought the unfair treatment was based on race. (Doc. 24-1, King Depo. at 42:17-23.) As such, Plaintiff has sufficiently established that she engaged in protected activity. *Pipkins*, 267 F.3d at 1201 (11th Cir. 2001).

### i. **Statutorily Protected Activity**

The causal link element is construed broadly, requiring only that the protected activity and the employment action are not completely unrelated. *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1260 (11th Cir. 2012). Temporal proximity alone is sufficient circumstantial evidence to create a genuine issue of material fact to establish an inference of retaliation if such proximity is "very close." *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010). *See also Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986) (finding a one-month gap between the protected activity and adverse employment action is sufficient to establish a causation).

Defendant argues that because Plaintiff cannot establish that "either Herd or Dr. Belinda—two of the three decisionmakers—had knowledge that she engaged in any protected conduct, Carlisle cannot establish a causal connection." (Doc. 17 at 23). However, Defendant fails to provide any support whatsoever that demonstrates *all* decisionmakers must be aware of the protected activity. *See, e.g., Clover v. Total*

*Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) (holding that, "[n]otwithstanding the close temporal proximity between the protected conduct and the initial decision to terminate the plaintiff," the plaintiff's retaliation claim failed because she could not establish a decisionmaker's awareness of protected conduct). Here, Carlisle was terminated the same day she made her race discrimination complaint to Dr. Melinda. Further, Dr. Melinda was one of the decisionmakers and was aware of Carlisle's complaint. Thus, Carlisle has sufficiently established a causal connection between the protected activity and her termination. Accordingly, Carlisle has established a *prima facie* case of retaliation.

### D. Pretext

According to Defendant, Plaintiff was fired for not seeing patients, insubordination, and combative behavior. (Doc. 24-11.) Plaintiff agrees that Defendant has satisfied its burden to articulate a legitimate non-discriminatory reason for the adverse employment action. As a result, for her retaliation and discriminatory discharge claims, Plaintiff has the burden to show that Defendant's proffered reason was not the true reason and that Defendant's conduct was based on racial animus. *Id*; *see St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993).

"To show pretext, the plaintiff must 'come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by the

employer were not the real reasons for the adverse employment decision.'" *Bush v. Houston Cnty. Comm'n*, 414 F. App'x 264, 267 (11th Cir. 2011) (quoting Wascura v. City of S. Miami, 257 F.3d 1238, 1242–43 (11th Cir.2001)).  The Plaintiff "may do this either directly by persuading the court that a discriminatory or retaliatory reason more likely than not motivated the employer, or indirectly by showing that the proffered reason is unworthy of credence." *Jefferson v. Burger King Corp.*, 505 F. App'x 830, 834 (11th Cir. 2013) (citing *Jackson v. State of Ala. Tenure Comm'n,* 405 F.3d 1276, 1289 (11th Cir.2005)). "In the end, our analysis is limited to whether a discriminatory and/or retaliatory animus motivated the employer." *Id.*  "That an employer's legitimate belief was mistaken is irrelevant so long as such animus did not motivate the employer's decisions."  See *id.*; Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir.1991)

Plaintiff has failed to show that she did not engage in the alleged violations. But, by showing other employees outside the protected class engaged in similar acts and were not similarly treated, Plaintiff has indirectly shown that the proffered reason is possibly unworthy of credence.

First, Plaintiff has failed to show she did not engage in the alleged violations. Plaintiff blanketly denies engaging in combative behavior and being insubordinate. (Doc. 25 at 23, 26, 27.) And Plaintiff attempts to show that Defendant's reasons for

firing Plaintiff were false by arguing that Defendant's statements in the evaluations of Plaintiff were inconsistent. However, the record clearly shows Defendant's opinion regarding Plaintiff shifts in the year and three months between Plaintiff threatening to punch a coworker in the face and her discharge.

In May of 2018, Plaintiff and Durrett were both counseled by Herd after Durrett opened a drawer that hit Plaintiff and Plaintiff then threatened to punch Durrett in the face if she did it again. Then, in April of 2019, approximately four months before Plaintiff was fired, Plaintiff's evaluation stated "It's a joy to have you on our team! We all love your joyful personality, just try to be less playful, more courteous to Lindsey because temps/patients might not understand your two's relationship." (Doc. 18-3 at 108.) When asked about this in her deposition, Plaintiff stated that she understood that, as of April 2019, the practice was concerned about her behavior towards Herd. (Doc. 18-3 at 109.) Then, on July 31, 2019, the day before Defendant fired Plaintiff, Herd and Plaintiff got into an argument, and Herd told Plaintiff that she was not being a team player and stated that people were afraid to ask her for help. (Doc. 25 at 12.) When Plaintiff was asked what about that argument was racial, Plaintiff could not give a concrete reason and responded that it felt like she was picking on her. (Doc. 18-3 at 140.)

Finally, on the day Plaintiff was fired, Plaintiff got into another heated argument with Herd. During this argument, Herd brought up the threat Plaintiff made in May of 2018 and that everyone thought Plaintiff was mean and not helpful. Plaintiff and Herd were "screaming at each other." (Doc. 18-3 at 150:8-9. During that argument, according to Dr. Melinda, Plaintiff was "invading [Herd]'s personal space and Plaintiff's tone and body language were very hostile. (Doc. 19-1 at 48-49.) After the argument, Plaintiff was sent home and later fired.

Two of the most heated arguments between Plaintiff and Herd came after her performance review where Dr. Belinda instructed Plaintiff to be more courteous to Herd.  Plaintiff arguing with Herd, an authority figure in the office, to the point of yelling and becoming very hostile shows that Plaintiff was both insubordinate and combative.

As evidence that the reasons given by Defendant were pretext, Plaintiff attempts to point out other employees outside the protected class that allegedly engaged in similar acts and were not similarly treated. Plaintiff primarily points to Durrett as an example of why Plaintiff acting insubordinate, combative, and failing to see patients is pretext. Plaintiff argues that Durrett engaged in the same conduct as Plaintiff and was not terminated. Plaintiff uses an Employee Warning Notice given to Durrett in March of 2020, nine months after Plaintiff's firing. The warning stated

that Durrett: (1) argued with and questioned doctors; (2) moved work to others without permission; (3) was unwilling to help others; (4) had body language and facial expressions that give the impression she did not want to be there. (Doc. 24-12.) The warning is signed by Herd. (Doc. 24-12.) However, Plaintiff and Durrett differ in material respects.

First, while she did argue with the doctors and Herd, there is no evidence that Durrett argued with a supervisor on back-to-back days and that the arguments involved yelling and hostile behavior. General allegations in the write-up that Durrett was arguing with and questioning doctors and unwilling to help others and Plaintiff's statements such as "multiple people had problems with [Durrett] in the office" do not evidence pretext. (Doc. 18-3 at 111.) Simply because both Plaintiff and Durrett argued with doctors, does not mean they engaged in the same basic misconduct. Here, there is evidence that Plaintiff was yelling and acting hostile towards Herd in the presence of Dr. Melinda. No such allegation has been made regarding Durrett. As such, the Court does not find that the reasons given for the firing of Plaintiff are mere pretext.

Here, Plaintiff was put on notice in April of 2019 that she needed to be more respectful towards her boss, Herd. Following that notice, Plaintiff and Herd got into at least two heated arguments, the last of which involved screaming and hostile

behavior and took place in front of Dr. Melinda. After such arguments, Defendant made the decision to fire Plaintiff.

"Put frankly, employers are free to fire their employees for 'a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir.1984)). The evidence shows that there are numerous nondiscriminatory reasons why Defendant fired Plaintiff. Plaintiff has failed to provide "sufficient evidence of racial discrimination to create a triable factual dispute." *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015). As such, Defendant's Motion for Summary Judgment regarding Plaintiff's retaliation and discriminatory discharge claims are due to be granted.

### E. Plaintiff Cannot Establish a "Convincing Mosaic" of Circumstantial Evidence.

An employee may survive summary judgment if a jury may infer intentional discrimination from a "convincing mosaic" of circumstantial evidence. *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). An employee may establish a convincing mosaic through evidence such as "(1) 'suspicious timing, ambiguous statements..., and other bits and pieces from which an inference of

discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Id.* (quoting *Silverman v. Bd. Of Educ. Of City of Chi.*, 637 F.3d 729, 733–34 (7th Cir. 2011)). Carlisle has not addressed whether she has created a convincing mosaic. The Court finds that the Plaintiff failed to meet her burden of creating an "inference of discriminatory intent." *Lewis*, 934 F.3d at 1185. Thus, Defendant is entitled to summary judgment as to the racial discrimination claim.

## IV.   Conclusion

Defendant's Motion for Summary Judgment is due to be GRANTED. The Court will enter an Order consistent with this Memorandum of Opinion.

**DONE** and **ORDERED** on June 2, 2022.

_____
L. Scott Coogler
United States District Judge

206888